The next case on our call is agenda number 10, 128-747, People v. State of Illinois v. Mitchell v. DeAndre Bush. Counsel for the appellant, are you prepared to proceed? Good morning, your honors. May it please the court and counsel. My name is Mark Fisher. I'm with the Office of the State Appellate Defender. I represent the defendant in this case, Mitchell Bush. Based on a series of gunshots, one of which killed Dwayne Jones and one of which wounded Nate Gulley in the arm, Mitchell was convicted in a jury trial of mob action, felony murder predicated on mob action. Second degree murder as a lesser offense of knowledge murder, aggravated battery with a firearm, aggravated discharge of a firearm, a lesser offense of aggravated battery with a firearm, and unlawful possession of a weapon by a felon. He was sentenced to consecutive terms of 65 years imprisonment for felony murder and 15 years imprisonment for aggravated battery with a firearm. Now, the appellate court recognized that the guilty verdicts of aggravated battery and aggravated discharge were legally inconsistent. So the court overturned those convictions, ordered a new trial, but limited to those charges, limited to the nonfatal shooting of Nate Gulley. The court otherwise denied all other requests for relief, affirmed the conviction and the sentence for felony murder. Three issues are before your honors today. One of those issues addresses felony murder. Under the facts of this case, Mr. Bush was not correctly found guilty of felony murder because he did not commit mob action. In fact, under the facts of this case, he was improperly charged with felony murder predicated on mob action. He therefore asks your honors respectfully to reverse outright the felony murder conviction. Counsel, did the indictment refer to any other participants other than Mayfield? I'm sorry, your honor? Who was included in the indictment of your client? Yes, thank you. There was one co-defendant charged, Henry Mayfield. He was charged with some of the same offenses with respect to the mob action charges. The allegation was that Mr. Bush acted with Mr. Mayfield to breach the peace and cause violence. In addition, for all- I have a follow-up question. I'm sorry, your honor. What was he alleged to have done? Anything specific during the trial that came out as his activity in breaching the peace? Right, so that's a very good question. First of all, in the charging instrument, the mob action only alleged that he acted with Henry and that he shot and killed- I'm sorry, shot and wounded Mr. Gulley, shot and killed Mr. Jones. With respect to the trial, evidence shows that there were two groups positioned on and outside the property owned by Minnie Roberson. One group inside the property included, among other people, Ms. Roberson, Nate and Gabe Gulley, and Dwayne Jones. Then there was a group of people outside the fence. There's videotape that was introduced as evidence of the jury trial. Video was taken by a neighbor who lived down the street from the Roberson residence. The videotape shows a confrontation. The state's theory in this case was that Mr. Bush went there to join with these people to confront the Robersons, to breach the peace, to cause harm. The evidence shows that is not what happened, but that was the state's theory in this case. So what does the evidence- Yeah, why do you say the evidence shows that that was not what happened? Okay. From the evidence, isn't that a reasonable inference that could be drawn from the evidence, that he went there to engage in this fracas that resulted? No, Your Honor. So first of all, Mr. Bush testified at his trial. And it's important to understand why he was there, because he was clearly there. He clearly fired the shots. But it's important to understand why he was there. His friend, also referred to as a cousin, Henry Mayfield, received kidney dialysis treatment earlier that day. Undisputed testimony that Kim Williams picked up Henry after his dialysis treatment, then picked up Mitchell. The sole plan that day was that Mitchell and Henry were going to quietly socialize together for the rest of the day, as they had done in the past when Mr. Mayfield received these periodic dialysis treatments. Counsel, but what about the fact that we are to look at this evidence in the light most favorable to the state? That's true. That's certainly true. The evidence in this case, particularly the videotape and two still photographs that are contained in the record that were admitted at the jury trial, support the defense position, support Mr. Bush's testimony. Was the jury entitled to reject your client's position on why he went there and what happened? Well, testimony, certainly credibility findings to be made by the trier of fact, absolutely no question. But the jury could not discount the videotape, could not discount the photographs that I'm referring to. Now, again, the videotape and just to briefly complete the thought, Kim Williams, as she was driving Henry and Mitchell to a place where they're going to spend the rest of the day quietly, received word that her and Henry's son had been beaten up by some adult males outside the Roberson residence earlier that day. So she picked up her son, drove all of them to this residence. Her testimony, she went there peacefully to talk to the parent, hopefully hoping to smooth over, resolve any differences. But, Counsel, you're arguing that there were no acts committed by Mr. Bush that brought his conduct within the purview of the mob action statute. Is that correct? That is correct. He did act that day.  But he did nothing prior to firing a gun. He did nothing else. But he was in the crowd. Well, he was at the scene because he was brought to the scene, was in his car, didn't have any purpose, any intent in going there. He was literally along for the ride. So that's how he comes to be at the scene. He was along for the ride, but he had a gun on him. He did have a gun on him. You explain why he had a gun on him. One bad decision among many made by many people out there that day. But, yes, clearly he had a gun and he fired it. And he exited the vehicle. I'm sorry, Your Honor. He exited the vehicle. He ultimately did exit the vehicle. There's absolutely no question about it. But the important thing is the State's argument, again, is that he went there for a purpose of engaging in mayhem, for lack of a better term. Went there for an improper purpose. Went there to join all these other people. Refresh my memory. On that phone call that they received when they were in the vehicle, did he hear that phone call? So there's a dispute. He said he didn't. Apparently it was on speaker. Whether or not he heard it. It was on speaker? I think there might have been some testimony about that. Mitchell said he didn't hear it. But regardless, once again, it's not his car. He's not driving the car. He's brought there. So even if he hears that, that doesn't translate into criminal intent or criminal activity. In any event, what's very important about the videotape is that you don't see Mitchell Bush until towards the very end of that videotape when he runs forward, has his gun elevated, and fires shots. In addition, the two still photographs I've referenced show him standing in the street doing absolutely nothing prior to the shooting, after this confrontation among these other people have already begun. In the first photograph, he's standing next to a woman in about the middle of the street. And they appear to be looking diagonally towards the Roberson residence. The second photograph, he's now standing at the curb outside the fence of the residence. But in both photographs, he's simply standing there. His hands are down at his side. He is observing. The latter part of the video showing him coming forward only at the very end. Plus, these two photographs support his testimony and support other defense testimony that he had no unlawful purpose or intent in going there, that he found himself on the scene. Initially, he's just observing. He only acts at the very end. Why does he fire the gun? He testifies that people on the Roberson side are yelling, yelling threats. Some of them have weapons. In a perhaps misguided attempt to diffuse the situation, he holds up his gun. And he says, I have a gun. At which point, he says, may Gully says back, yeah, we got guns, too. And then he looks and sees his friend Henry, who's just come off a dialysis treatment, fighting with Duane Jones. He knows Henry has a catheter. He knows Henry has been receiving these periodic treatments. He's concerned for Henry's safety. He's concerned for his own. That's why the jury is ultimately instructed on self-defense and defense of others. And, again, one of the verdicts in this case is second degree, meaning the jury accepted much of his testimony, that he has sincere belief in the need to act in defense of himself and Henry. But, in the end, it was unreasonable. So the photographs and the videotape support the defense that he did not engage in mob action. He did not join these people. He did one thing. Now, that's incredibly serious and in no way, shape, or form do I want to minimize his conduct that day. He fired shots. Tragically, one man died. One man was wounded in the arm. He survived. So he was properly prosecuted on the original charges in this case, which were knowledge murder and aggravated battery with a firearm. There should have then been a question for the jury, okay, clearly he fired these shots. Did he act with criminal mental state? Did he act with self-defense? That should have been what this case was limited to. By charging felony murder, where there was no basis for it, the state, in effect, did what this court warned about. In cases like Davis v. Davis, they eliminated second degree murder. They eliminated the jury's verdict of second degree murder. And, of course, as we've discussed, Davis and Davis in both cases have said, yes, felony murder in a given situation can be predicated on mob action. But there are guiding principles. The conduct that causes mob action, if there is conduct that causes mob action, cannot be the same conduct that results in the killing. Or put another way, mob action cannot be inherent in or arise out of the killing. In addition, the defendant, to be guilty of both, must act with independent felonious purposes. He acted with one purpose in this case. That was to defend himself and his friend. Again, the jury accepted much of that testimony, simply finding that although he had the sincere belief under the circumstances, it was unreasonable. So in this case, prosecute him for firing the gun. Perfectly, perfectly reasonable. And defendant is not quarreling with anything this court said in Davis v. Davis, and I want to make that clear. Simply under the circumstances in this case, he wasn't properly prosecuted for felony murder or mob action. He wasn't proved guilty of those offenses. And, therefore, respectfully, this court should reverse outright the felony murder conviction. Now, as noted, the appellate court remanded for a new trial, but limited to the shooting of Nate Gully, the aggravated battery with a firearm. This court should expand that new trial to include the fatal shooting of Dwayne Jones, limited to second-degree murder. For the two alternative reasons set forth in Issue 2, both of them involving key prosecution witnesses, Nate and Gabe Gully. At some point after the shooting incident, the Gully brothers made a rap video in which they talked about the events of that day, including the shooting. Prior to trial, defense counsel asked the judge to be allowed to introduce that videotape in the event that the Gullies testified inconsistently with it. Counsel, who was the intended audience of the video? That is an excellent question that is not resolved in the record. The state's attorney argued to the judge that this was made solely, it's a rap video, it must have been made solely for entertainment purposes. We really don't know that. Apparently it was posted to somebody's social media site, maybe Facebook, I don't know, and I guess that's where it was found. But beyond that, we don't know. Was there any testimony as to why it was made? No. Now, had it been at a trial, I imagine some of those things would have come out, but none of those questions, and there are certainly good questions, none of them were explored during the pretrial hearings. So there was no offer of proof, a hearing outside, you know, the presence of a jury to explore the basis for asserting that the video should come in? The videotape was played for the judge, I believe it was played for the judge. It's part of the record as well. It was played for the judge again during the pretrial proceedings. But no argument or explanation? No, the only argument, really, the prosecutor, one of the two trial prosecutors argued, well, because it's a rap video, presumably it was only made for entertainment purposes, and therefore it's not the type of statement that could be admitted either as a prior inconsistent statement or as substantive evidence under 725 ILCS 5-115-10. Counsel, I didn't hear your answer to Justice Holder White's question about whether there was any offer of proof or whether counsel saw the hearing outside of the jury with respect to the admission of the videotape. Again, the videotape was played for, the judge saw the rap video. So in terms of offer of proof, I'm not sure what more, the judge saw what it was. He simply said, oh, it's a rap video, and it cannot be truthful as a matter of course, so I'm not going to admit it. That was the judge's ruling. All right. Clearly, it's a vastly overbroad ruling. First of all, it's up to the trier of fact to decide whether a prior statement is truthful or whether the testimony is truthful. That's not a decision the judge should be making pretrial. Secondly, even if you consider this a work of art, I guess that's legitimate, just like any so-called work of art, no matter the type of thing it is, a song, a book, a movie, et cetera, yes, some can contain truth, some can be fiction. That goes to the weight, that can be argued to the trier of fact and decided by the trier of fact. Ironically, several other jurisdictions, state and federal, have confronted this issue in doing so. It's been in the context of the prosecution attempting to introduce rap lyrics written by the defendant. And those cases by and large have said, yes, that can be admissible at trial, with the caveat that there must be a connection or nexus shown between the statement and the incident for which the defendant's on trial. Here it's apparent that these two brothers were talking specifically about this incident. Prosecutors in the trial court didn't argue otherwise. State-owned appeal here has not argued otherwise. So this was clearly an erroneous ruling by the judge. Mitchell was also denied a fair trial because the Gulley brothers' grandmother sat on the jury. Now, she told the judge she didn't have a close relationship with them and she would not be biased. Perhaps, therefore, she did not have actual bias, but this court should hold that she had an implied or implicit bias. Especially as the facts unfold and it's clear that Mitchell fired the shots, the only question is the mental state. There's a risk here that she would ultimately side with her grandsons over the defendant. Now, was she really their grandmother? Well, so I would say yes. Now, there are references, in fact, in the opening brief filed in this case to Scott's grandmother. What she told the judge and attorneys is that her daughter or her daughter-in-law was the mother of the Gulleys. Her daughter was married to another woman who was the mother of the Gulleys. Now, they didn't get much into much more detail. So it's unclear. Were these two women who fell in love and married and decided to have children? We don't know. I know the red light's on, but could you just give us a standard? How do we look at implicit bias? So implicit bias is where the relationship between the juror, potential juror, and a party to the litigation, or as in this case, key prosecution witnesses, is so close that the danger is simply too great that this individual would side with that part of the litigation. And I would submit if this were reversed and this was the grandmother of the defendant, the prosecution would be yelling, no, no, this person can't sit on the jury. That should be the standard. Thank you, Your Honors. I see my time is up. I will come back and we'll find out. Thank you. Counsel for the afternoon. Good morning, Your Honors. Counselor, may it please the Court to assist in Attorney General Gerson Fisher for the people. Your Honors, as my friend noted, there are three issues presented by this case. I'd like to begin, same place my friend did, with the question of felony murder. As an initial matter, there was sufficient evidence to prove that the defendant here committed the offense of felony murder. There's been a lot of discussion about what the defendant knew and when he knew it, but ultimately none of that is actually necessary to establish his participation in a felony murder. All that was necessary is that he and Henry and Henry's friends and family together acted to disturb the peace through the use or threat of the use of force and violence. So what happened at the scene was sufficient in and of itself. This Court's decision in Davis is incredibly instructive here. There you have a group of people going around a neighborhood looking for what they believe is a stolen television. Another group of neighbors comes out and confronts them. You have a fight. During the course of the fight, someone gets hit and possibly with a two-by-four, possibly kicked. There was conflicting evidence and killed. The defendant in that case didn't join either group until after the fight had already broken out. So there's no requirement that there be some sort of pre-planned arrangement to get together as a group and disturb the peace. If the defendant here had simply been walking down the street and come upon these two groups facing off and pulled out and brandished his gun and made threats as he himself testified, made threats with that gun and then fired off a bunch of shots while Henry and his friends and family were engaging in their own threats and carrying their own sticks and engaging in violence against the other group, that in and of itself is sufficient to establish mob action. Now, we do have here plenty of additional evidence that the defendant knew exactly what he was getting into when the car pulled up at the scene. Whether he was planning to go to the scene beforehand or not, there was this phone call on speakerphone according to testimony describing the events that had happened earlier in the day. Jay Orion, who was involved in the earlier conflict, gets into the car before they drive to the scene of the second conflict where the shooting occurs. So when they pulled up to the scene and there are two big groups facing off down the driveway across the fence, there's ample evidence that the defendant knew exactly what he was getting into when he got out of the car, when he started brandishing a weapon, when he fired those shots. So based simply on what happened at the scene, throw in this additional evidence that he knew exactly what he was getting into, there's certainly sufficient evidence to satisfy mob action here. So then we get to the question of whether mob action in this case is a proper predicate felony for felony murder. Defendant's own testimony is that he was not acting with the purpose of killing the victim or indeed shooting anyone. Indeed, he testified that he didn't think the way he was firing the gun was likely to hit or injure, much less kill, anyone. So this court has talked about the independent felonious purpose test as sort of a question of causation. Defendant in this case was committing mob action. And because he was committing mob action, someone got killed. That is a proper felony murder charge. Now, certainly there are improper cases where what the evidence shows is that the defendant was acting with the purpose of shooting and killing the victim. And because of that, the court can look and say, well, you've also committed these, or the state's attorney could look and say, well, you've also committed these other felonies. We're going to do an end run around second-degree murder, self-defense, proving our mens rea, and charge you with felony murder based on these other felonies that you committed just because you were committing a murder. That's not what happened here. By defendant's own testimony, he was committing mob action. And in the course of committing mob action, someone died. That is exactly what felony murder exists to prosecute. That is the purpose of the felony murder statute. My opponent referenced the concept of requiring a separate felonious act. That is not part of this state's test for felony murder. This court has repeatedly asserted that, although, to be clear, based on the not infrequent confusion of the lower courts, this might be a good opportunity for the court to state clearly and unequivocally that we don't have an independent felonious act requirement, as Justice Garmon, for example, repeatedly asked her colleagues to do in concurrences and dissents in prior felony murder cases. Such a requirement would be inconsistent with the plain language of the felony murder statute. I mean, for example, arson is a specifically enumerated forcible felony that can underlie a felony murder charge. If we imagine a scenario in which someone sets fire to a home that they believe to be empty, turns out it's occupied and the occupant dies, that is clearly under the plain language of the statute felony murder. But if the court were to require a separate felonious act, the state wouldn't be able to prosecute that as a felony murder, as the General Assembly intended. So the separate felonious act test is just inconsistent with both the plain language and purpose of the felony murder statute. This court should make crystal clear, because the lower courts have apparently required some further direction, that the safeguard against the improper use of felony murder is the independent felonious purpose test. And in this case, there was an independent felonious purpose, and so mob action properly served as a predicate felony for felony murder. And that conviction should be upheld here. I'll turn to defendants' additional claims. Defendant now appears to be raising them solely as two separate claims, and I'll address them as such. I would note there's some discussion through the briefing process that these claims collectively deny defendant a fair trial. That certainly sort of sounds like a cumulative error claim. That wouldn't be supported here, because one of the two claims is waived. And you can't simply attach a waived claim to a preserved evidentiary claim and get around principles of waiver forfeiture, the standards under ineffectiveness of counsel, and so forth. So to the extent that there is still a cumulative error claim based on these claims floating out there, it fails on that basis. But turning to the two individual claims, again, I'll address them in the same order my friend did. The rap video is hearsay. You can sort of walk through the process. It is hearsay. It does fall into a hearsay exception in that it is a recorded statement by an eyewitness to the events. That is sufficient to establish sufficient reliability that it could be admitted. But this court has been clear that that is not necessarily the end of the inquiry for a trial court. It is allowed to look at other factors to determine whether the particular hearsay has an issue of reliability or unreliability, and that its decision on that front is subject to an abuse of discretion analysis. The judge's decision here was not arbitrary and capricious. Numerous other jurisdictions, lower courts in Illinois, have noted that artistic statements do carry certain issue of unreliability. There is often exaggeration. I think it was called correctly the New Jersey Supreme Court that noted that no one thinks Edgar Allen Poe actually has a beating heart buried in the floorboards of his home. So the judge's decision to not admit the rap video here was not arbitrary and capricious. It wasn't an abuse of discretion, despite the fact that it fell into a hearsay exception. But moreover, to the extent it was error, the error was plainly harmless. In terms of the reliability of the statement, I would concede that it is essentially entirely consistent with the testimony that was introduced at trial. So it was purely cumulative and was harmless in that way. Also, its purpose was to establish the defenses of self-defense and second-degree murder mitigation, which, of course, are not relevant to felony murder. And it clearly didn't prevent a defendant from raising these issues at trial in any event, because the jury did mitigate his knowing murder conviction to second-degree murder. So the decision not to admit it was not abuse of discretion, and even if it was, it was plainly harmless. The final issue here is the allegedly biased juror.  There is an affirmative acquiescence to the juror remaining on the jury by defense counsel. He was specifically given an opportunity to challenge the juror's continued participation in the trial at the time when she realized her relationship to the victims. And I'll return to that point in a second. Counsel declined that opportunity. To allow counsel to make that strategic choice in that moment and now turn around and say that juror was biased, express or imply, would undermine all of the principles of waiver and forfeiture that this court has long recognized. There was some discussion post-trial that maybe counsel did that based on a misunderstanding of the relationship between the juror and the victims. That obviously leads into one of the two avenues where a waived claim can be pursued, which is ineffective assistance of counsel. But in this case, counsel was not ineffective for a couple of reasons. As an initial matter, the court had expressly articulated that it didn't even think this was a close call. So any motion would have been fatally doomed, and counsel can't be ineffective for failing to bring a doomed motion. But moreover, the court was absolutely right in that assessment. The court did re-voir dire the juror. She clearly, unequivocally stated that she could remain fair and impartial. She had no relationship or no opinion of the victims themselves that would in any way influence her impartiality. So clearly there's no express bias here. Turning to the question of implicit bias and Your Honor's question about the standard there, this court has explained that it is an extraordinary circumstance where the relationship is such that we assume an implied bias on part of a juror in the face of their own testimony, that they are not biased. This was clearly not that scenario. As an initial matter, you know, we're not actually talking about the victim's grandmother. We're talking about, you know, the victim. Ginsburg. Could I stop you here? What's your standard review? So first of all, you said the standard for implicit bias, it's extraordinary, but are there factors that the court's to look at? And then secondly, what is our standard review of that determination? If I may, Your Honor, I'd like to address those in the opposite order. As an initial matter, at most this court is reviewing this issue through the lens of forfeiture and plain error. So we're looking to see whether there was a clear and obvious error here. As a second matter, the courts have seemed to address this implied bias question on sort of a case-by-case, very fact-dependent basis. So I'm not sure we've got specifically articulated factors that we can look at. But certainly those cases have laid out some parameters that we can draw a box around what is implied bias. Where the courts have found implied bias, it's in the case of a close relationship. The victim left their older child in the juror's care while in the hospital giving birth to a second child. They were friends and spent extensive time together. What we have here, and this is actually consistent with some of the cases that explicitly found there was no implied bias, is a juror who didn't even realize she had any relationship with the victims. When she saw their names, when she initially saw them testify, it wasn't until she saw her daughter's wife in the gallery that she realized, oh wait, those are my daughter's wife's kids from her prior relationship. So that's a strong indicia that this is not the kind of relationship from which the court would identify an implied bias. In the face, again, of the juror's expressed testimony that she didn't have an opinion of these people, that she hadn't formed any basis on having known them or having encountered them before, and that she would remain fair and impartial. That is especially true if the court's looking at it through the lens of a clear and obvious error in the plain error context, or if the court is looking at whether defendant was prejudiced by counsel's failure to make this kind of motion where the trial court itself had already indicated that it thought that this was an easy case on this question. I'm not sure if standard review is the right term. Looking through the lens of plain error, there are a lot of layers here. But what are we to do with the trial court's statements, in other words? How do we review that? How do we determine if that was error, plain and obvious error? The trial judge was there, saw the people, saw their reactions much closer to the scene than we are. How are we to view what happened there? Well, so certainly it would be even outside the context of a plain error analysis. If we hypothesized that this had been preserved and the court had simply ruled that there was no implied bias, I think the court would treat it the same way that it would any denial of a forecaused challenge during the voir dire process where the court's presence in the room with the juror conducting the voir dire, seeing their responses, would be given deference. Having said that, I do think that there are—and this is not that case— but I do think that there probably are cases where, as a matter of law, the relationship between a juror and the victim might be so close that it is simply— that there is an implicit bias that must be assumed as a matter of law,  I mean, if, for example, the juror was the victim's mother and had lied about that fact and then it came to light in post-trial or something, the question of whether that gives rise to an implicit bias would be a question of law, that this court would review de novo, but that's obviously not what happened here. If the court doesn't have any further questions, the people would just ask that this court affirm the judgment of the appellate court. Thank you, Your Honors. Thank you very much. Counselor Neubau. Thank you, Your Honors. First of all, with respect to the juror, counsel said there was some discussion at the post-trial motion stage that perhaps counsel misunderstood the relationship. There was more than just some discussion. Counsel very clearly and forthrightly said to the judge, I did not hear the relationship between this juror and the Gulley brothers when we questioned her earlier in the case. He said, I thought that she just said she knew the mother of the Gulleys, not that her daughter was married to the mother of the Gulleys. So I agree in general, you know, a weak excuse, a laying back in the weeds, so to speak, that shouldn't be allowed. This was not a laying back in the weeds type of situation. In any event, there is an alternative ineffective assistance of counsel argument being made here, because he should have heard what was said. If he wasn't sure, he should have asked for clarification. But beyond that, the defendant submits. The judge should have at least said to the attorneys, look, I'm very uncomfortable. This woman is related to these two key prosecution witnesses. One of them was a direct complainant slash victim shot in the arm. The other is his brother standing right there by the grace of God, wasn't shot, could have been. Just too close a relationship. Beyond that, I'm sorry. Direct us to any case in our state that has found implicit bias in this, in what was the closest factual situation that where a court has found implicit bias? Closest to your facts. There are cases discussed in the briefs, unfortunately, Your Honor. I can't give you a very good question in terms of it. Now, I agree that in most cases it's a situation, a parent, a child, a sibling. I'll grant you that. What I would also say as well that I think this court should consider is that even if this juror would not have necessarily felt compelled to have to explain not guilty verdicts to the grandsons, there's a very real danger that she would have or might have felt compelled to explain not guilty verdicts to her daughter or to her daughter-in-law for fear that otherwise that would be the end of that relationship. That's very important, I think. It's also important. My other question is then, again, as I asked your point, what do we do about this? We were not there. We didn't see the witnesses. We didn't see how she reacted or anything like that or the lawyers. What's our standard review? The trial court said this is not even a close case. What do we do with that? And, frankly, that statement boggles my mind. I don't understand. Again, if the jury were on the other foot, if this woman were the grandmother of Mitchell Bush, I can only imagine the prosecutor's reaction, the state's reaction. And, clearly, counsel, as he said, the post-trial stage, and it's completely credible, he would have been saying, no, judge, bring in the alternate. There was an alternate here. That's very important. Case law has said if there is implicit bias, it is on the judge to remove the individual. Because, again, even if the person says, yeah, I think I can be fair and impartial, you don't take that risk. It's just too great. And especially in a case like this where the evidence is close. We know the evidence is close as to Mitchell's mental state because of the verdicts returned by the jury. Just too great a risk and a danger in this case. And, as I say, alternatively, your honors can find that counsel was ineffective. With respect to the rap video, the judge shouldn't be looking for other indicia of reliability where we're talking about an inconsistent statement. The question is, is it inconsistent with testimony? Alternatively or in addition, does it satisfy the requirements of 115-10.1? Again, this was all done pretrial, but there were inconsistencies here because Gabe Gulley testified at trial. He didn't really remember much of what happened that day. His recollection, he and his brother were just standing there doing nothing. Shots were fired. Clearly inconsistent with the video. And even Nate, who chimes in on the video at the end, yeah, this is a real-life story. I agree with what my brother said. The videotape suggests a more aggressive mindset by Nate, which is important to the question of self-defense and whether he acted in perfect self-defense or not. So this is something that should have come in. Let the jury decide whether it's truthful, whether it's artistic license, et cetera. With respect to felony murder, my opponent says because Mitchell committed mob action, someone got killed. No. Someone got killed in its traffic, but someone got killed because Mr. Bush fired a gun. That's why I say he was appropriately prosecuted. He was appropriately charged with knowledge first-degree murder and aggravated battery with a firearm. And those were the original charges. The state only added the felony murder charge after they found out. He talked to the police, said he was scared, was concerned for his cousin, concerned for himself, didn't know what to do, and fired. Only after that did the state charge felony murder. Now, state has great charging leeway, no question about it. Again, though, this court very, very legitimately stated in Davison that felony murder should not be used to eliminate second-degree murder or to eliminate the need to establish the mental state that goes along with intent or knowledge murder. Unfortunately, in this case, felony murder did eliminate the second-degree murder verdict returned by the jury. And so this is something that should not have happened. This court should act. The state mentioned the separate act analysis. This court rejected the state's argument in Davison. There's no reason to accept it now in any event. I think it's certainly important. It's a valuable part of the analysis in some cases. What defendant focuses on here is the question, did he act with separate purposes or intent? No, acted with one purpose, firing the gun. Very serious. But that's not mob action. And the state says he came out with the gun as soon as he got out of the car, as soon as they got there. Look at the photos. Look at the videotape. You'll see that's not true for all of these reasons. Respectfully, this court should reverse outright the felony murder conviction, should expand the new trial to include the fatal shooting of Dwayne Jones, limited to second-degree murder. And the alternative, Your Honors, don't expand that new trial. After reversing outright felony murder, this court should order reinstatement of the second-degree murder conviction and direct the judge to sentence Mitchell for that offense after concluding the trial that was ordered by the appellate court. Unless Your Honors have questions, I thank you for your time today. Thank you both very much. This case, Agenda Number 10, Number 128747, People of the State of Illinois v. Mitchell, DeAndre Bush, will be taken under advisement.